J. F. ASH, Appellant, v. CENTURY LUMBER CO.

**Master and servant:** RELATIONSHIP: NEGLIGENCE: LIABILITY.   A serv-
ant may be in the general employ of one person and at the same
time be employed in a particular capacity for another without
being an employee of the latter; and whether he is the servant
of the one or the other in doing a particular act depends on

which has the right to direct or control him in the performance of the act. In this action for a personal injury to a pedestrian it appeared that the defendant employed a man and team to haul lumber, paying a certain price per day for the services of both which was divided equally between the owner of the team and the driver. The defendant furnished the wagon but exercised no control over the driver or outfit except to direct the delivery of lumber from one place to another: *Held,* that the driver was not an employee of the defendant so as to render it liable for injury to the pedestrian through the negligent handling of the team by the driver.

**Same:** NEGLIGENCE OF SERVANT: LIABILITY OF MASTER. The master is responsible to strangers for the negligent acts or omissions of his servant done in the course of his employment, but if the servant is acting for himself or another the master is not liable.

**Same:** EVIDENCE. In this action for injury to a pedestrian by a runaway team the evidence is held to present a question for the jury as to whether the driver was negligent in leaving the team untied while unloading lumber, and in doing which the team was frightened by a plank falling upon one of the horses.

**Same:** NEGLIGENCE OF DRIVER OF TEAM: LIABILITY. The owner of a team is responsible for the negligent conduct of the driver, where the team and driver have been let to another to do certain work, in the performance of which the driver in the management of the team is not under the direction of the hirer.

**Same:** NEGLIGENCE OF EMPLOYEES: EVIDENCE. The evidence in this action is held insufficient to show negligence on the part of the employees of the defendant lumber company while assisting the driver of the team in unloading lumber.

*Appeal from Polk District Court.*—HON. W. H. McHENRY, Judge.

MONDAY, DECEMBER 18, 1911.

ACTION for damages resulted in a directed verdict for defendant. Judgment was entered thereon. Plaintiff appeals.—*Affirmed.*

*Thomas A. Cheshire,* for appellant.

*Carr, Carr & Evans* and *O. M. Brockett,* for appellee.

LADD, J.—One R. L. Cruse had loaded a wagon with two-inch plank, a foot wide and thirty feet long, and had driven along the east side of a railroad car with his team toward the south. The wagon reach had been lengthened, but the planks extended over the back bolster about thirteen feet. The lines extended to the rear hub and were laid on the ground east of the wagon and the outside tug unhooked. The front end of the wagon was opposite the car door. Employees of defendant assisted Cruse in removing the lumber from the wagon into the car. In doing this, Cruse stood at the rear of the wagon, lifted the end of a plank so as to place it on the east hind wheel, and, by bearing down and swinging out, lifted the other end so as to clear into the doorway of the car. One man then seized the other end of the plank and drew it in through an opening at the south end of the car until the other could take the plank through the doorway. Cruse had placed a plank on the wheel and swung the end over, when it caught in the edge or jamb of the car door frame. According to his story: "This happened because I suppose I misjudged my distance in raising it and did not raise it high enough at the south end. It caught about midway up from the door. At that time, there was a man standing at the car door, and he could have reached it. When it got caught, I attempted to raise it up by bearing the north end of it down. While I was doing this, it broke loose from the door, fell, and struck the west horse." The team immediately started to run, and, after they had gone a little ways, the hind wheel caught on a post and swung the team around, and at the same time the lumber slid off, striking the plaintiff, who was in the street, and throwing him upon the pavement, causing serious injuries.

It is alleged that Cruse and the other employees were negligent: (1) In that they failed to tie, secure, or un-

hitch the team from the wagon; (2) that Cruse was negligent in that he did not draw the plank far enough back so as to avoid hitting the car and prevent it from falling; and (3) that the employees in the car were negligent in failing to take hold of the plank and prevent it from falling on the horse.

The ruling on the first two grounds turns on the issue as to whether Cruse, in handling the team, was the servant of defendant, for he was not shown to have been negligent in the manner of unloading the plank, and, if guilty of any fault, this was in allowing the team to stand without hitching, or where, in event of a plank falling, they would be likely to be struck and frightened thereby. Was there sufficient evidence to carry the case to the jury on either of these issues? This necessarily depends on whether, in the handling of the team, he was the servant and under the control of defendant. The evidence disclosed that defendant owned the wagon, but that the team and harness belonged to Mrs. W. W. Wright. Long prior to the accident, her son had inquired of defendant's foreman if he could use another team. The foreman answered that he could, and asked whose it was, and, being told that it belonged to Mrs. Wright, and that it was a good team, directed him "to send him on down to work." One Mason came with the team in the morning and hauled lumber with it several months. He then arranged with Cruse to take his place, and after that Cruse drove the team, from July 18, 1907, until long after the accident, which occurred in May, 1908. The arrangement between Mrs. Wright's son and Mason was that he receive one half the earnings and Mrs. Wright the other half, and, without any conversation concerning the matter, she and Cruse divided the earnings in the same way. Defendant's bookkeeper inquired of her, when each began, whether payment should be made to her or to the driver, and she directed payment to the latter, as she trusted him. Compensation was made at the end of each week

at the rate of $3.50 per day. According to Mrs. Wright's testimony, "He took the team as he pleased, as if it was his own, and collected for it." The horses were kept in Mrs. Wright's stable most of the time Mason drove them and all of the time Cruse did so. She furnished the feed and paid for shoeing. Cruse cared for and fed the horses. She never had anything to say about where Cruse went, nor did she "exercise any control over him in any way or direct his movements." She had nothing to do with the bargain with the defendant save as mentioned. When Cruse began work, the defendant's foreman inquired whether he was going to drive the team, and, on being told that he was, gave him a written order for a load of lumber, and where to take it, and this was the uniform practice while he remained there. Ordinarily, a laborer employed by the company helped him to load up. Upon delivering, he had the ticket signed by the recipient and returned it to the office.

The company seems to have had nothing to do with the way Cruse cared for or handled the team. The employment at the Century Lumber Company was somewhat irregular, and he was sent occasionally to do hauling for the Charles Weitz Sons, contractors, the foreman directing him so to do, but he was paid always by defendant. If Charles Weitz Sons desired the team to haul, after Cruse had quit for the day, they would telephone at the instance of the foreman to Mrs. Wright, and she would tell Cruse what was wanted. He did not drive the same team all the time, as Mrs. Wright had five horses, and he and the driver of the other team, who was her son, sometimes changed teams, and, during the winter, he teamed considerably for others than the defendant and the Charles Weitz Sons. According to his testimony, neither the Century Lumber Company nor Charles Weitz Sons had anything to do with the care or handling of the team, and Charles Weitz, a director of defendant, testified that the yard foreman "used

his judgment which team shall take this order or that order, and the directions are put on there (paper) where to take it. As to how to drive the team, he don't—Sometimes he will direct them which road if he knows the best place to go. Q. Has he any instructions or any authority to tell any teamster how to take care of his team? What he shall do to make the work and use of his team safe? Whether he shall curry it or not, or how he shall handle his team? A. No, sir. Q. Does he, to your knowledge of it, exercise any authority in the way of instructing any of the teamsters with respect to that? A. Not as we know of. Q. Has he any authority, or does he exercise any to your knowledge, to do anything with the teamsters except to tell them what loads to haul and where to take them? A. That is as far as he goes, because the drivers would generally tell him where to get off at if he went to dictating to him as to how to handle his team." After testifying that the defendant owned some teams and selected the drivers of them and did not select drivers of teams owned by others, he was then asked if to his knowledge the officers or employees of defendant "ever exercise any authority over the drivers of teams not owned by the company. A. No, sir. Q. By way of telling them how they should drive their teams, or how they should secure them or care for them in their work? A. No, sir. Q. Did any officer of the company or any representative of the company have any authority from the company to give such instructions or attempt to exercise any such control or interfere in any way with the drivers of teams not owned by the company, except to tell them what material to get and where to get it and where to take it to? A. No, sir. Q. That is true with reference to Cruse and all of those men, is it? A. Yes, sir; that includes them all."

The facts have been recited in detail because of the paucity of direct evidence relating to the employment of the team and of the driver. The relation of the parties

must be determined by inferences to be drawn from these facts. Doubtless an intelligent teamster in a retail lumber yard readily understands from slips indicating the material and destination what is required of him without being told more explicitly. So it may have been unnecessary for the owner of the team to pursue the driver employed by him with instructions. Mason arranged with Mrs. Wright's son to drive and care for her team of horses; she to furnish harness, feed, and bear the expense of shoeing, he to care for and drive the team and each to receive one-half of what he earned with it. Cruse merely stepped into and took Mason's place. The only restriction on either side from dividing the earnings was that implied by law, i. e., that they exercise ordinary care in handling and caring for the team, and in this respect both were responsible to Mrs. Wright.

It is well settled that a servant may be employed generally for one person and at the same time in a particular capacity for another. This occurs whenever the general employer engages his employee to work for a third person, and whether the employee is the servant of the one or the other in the doing of any particular act depends on which has the right to direct or control him in its performance. A man may engage to work with his own team for another without yielding to that other the control or management of his team, or he may so hire himself and team to the other that the latter shall be in control of both. Now, it is not very material whether Cruse be deemed to have been employed by Mrs. Wright as driver of her team or to work with the team as though it were his own and share the profits, if, in either event, he retained the authority to handle and control the team independent of any dictation by the defendant. That the latter so construed its engagement of the services of the driver and team is put beyond question by this record. At no time during several

1. MASTER AND SERVANT: relationship: negligence: liability.

years did its officers or foreman ever suggest to the driver the manner of the care or handling of the horses, and, as seen, Weitz testified that the company had conferred on neither officer nor foreman any such power. Cruse and Mrs. Wright construed the employment in the same way, for at all times Cruse managed and controlled the team with her acquiescence and consent. While the defendant at any time might have interrupted the employment of the man and team in hauling, it was without authority to discharge Cruse as driver of Mrs. Wright's team or to substitute another in his stead as driver thereof. The only direction the company ever gave him was the notation on the slip of paper of the materials and their destination and sometimes a suggestion of the route to be taken. This practice was pursued for several years—so long that the only inference to be drawn is that under his employment he was merely to haul materials from place to place, and that the method to be pursued, the details, was left entirely to his discretion.

It is not material, then, whether Cruse was in Mrs. Wright's employment as servant, or in charge of the team as hirer of it, or under a mutual arrangement to divide the profits, save as his relation to the owner may help to determine whether he, in the management and handling of the team, was acting as servant of the defendant; for one who employs a servant to do his work is answerable to strangers for the negligent acts or omissions of such servant committed in the course of his employment. The reasons for this are, in substance, that the master is answerable for the wrongs of his servant, not because he has authorized them, nor because the servant in his negligent conduct represents the master, but because he is conducting his master's affairs, and the master is bound to see that his affairs are so conducted that others are not injured. *Farwell v. Railway*, 4 Metc. (Mass.) 49 (38 Am. Dec. 339). Of course, the

2. SAME: negligence of servant: liability of master.

master's responsibility is not to be extended beyond his work. If the servant in what he does is acting for himself or another, the master is not answerable for his negligence therein.

The evidence was such as to carry the issue as to whether Cruse was negligent to the jury. He testified that lumber had previously dropped on the horses, and that **3. Same:** sometimes they would jump, and that he **evidence.** knew if lumber was dropped on them in the way this lumber fell they would run and jump. He placed the team where this might happen, and, as he left them standing without being hitched or otherwise guarded, he might have been found to have been negligent. *Migliaccio v. Smith Fuel Co.,* 151 Iowa, 705. The district court in directing a verdict then must have concluded that there was no evidence tending to show that in the handling of the team he was the servant of defendant. It is often difficult to determine for whom a particular act is done. The rule was laid down by Littledale, Jr., in the first of the so-called "carriage cases" (*Laughor v. Pointer,* 5 Barn. & C. 457), that he is master who has the right of control over the person inflicting the injury at the time it was inflicted. In *Linnehan v. Rollins,* 137 Mass. 125 (50 Am. Rep. 287), the court approved an instruction to the effect that "the absolute test is not the exercise of the power of control, but the right to exercise the right of control." In *Higgins v. Teleg. Co.,* 156 N. Y. 75 (50 N. E. 500, 66 Am. St. Rep. 537), it is said that: "The doctrine of *respondeat superior* applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of the wrong at the time and in respect to the very transaction out of which the injury arose. The fact that the party to whose wrongful or negligent act an injury may be traced was at the time in the general employment and pay of another person does not necessarily make the latter the master and

responsible for his acts. The master is the person in whose business he is engaged at the time and who has the right to control and direct his conduct. Servants who are employed and paid by one person may nevertheless be *ad hoc* the servants of another in a particular transaction, and that too when their general employer is interested in the work." See, also, *Wyllie v. Palmer*, 137 N. Y. 248 (33 N. E. 381, 19 L. R. A. 285). In Wood on Master & Servant, section 287, it is said: "In order to be held chargeable for the acts of another, the person sought to be charged must at least have the right to direct such person's conduct and to prescribe the mode and manner of doing the work, the person for whose acts he is sought to be charged must, at the time when the act complained of was done, not only have been acting for him, but also must have been authorized by him, either expressly or impliedly, to do the act." Or, as expressed in section 317: "The real test by which to determine whether a person is acting as the servant of another is to ascertain whether at the time when the injury was inflicted he was subject to such person's orders and control and was liable to be discharged by him for disobedience of orders or misconduct."

The rule laid down in Shear. & R. Neg. (4th Ed.) 269, is that: "He is to be deemed the master who has the supreme choice, direction, and control of the servant and whose will the servant represents not merely in the ultimate result of the work but in all its details. The payment of an employee by the day, or the control and supervision of the work by the employer, though important considerations, are not in themselves decisive of the fact that the two are master and servant. . . . Servants who are employed and paid by one person may nevertheless be *ad hoc* the servants of another, in a particular transaction." As said in *Butler v. Townsend*, 126 N. Y. 105 (26 N. E. 1017): "One may be employed without being a servant. The relation exists where the employer selects

the workman, may remove or discharge him for misconduct, and may order not only what work shall be done, but the manner and mode of performance." In *Standard Oil Company v. Anderson,* 212 U. S. 221 (29 Sup. Ct. 254, 53 L. Ed. 483), Mr. Justice Moody, in speaking of this proposition, said: "It sometimes happens that one wishes a. certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men may become *pro hac vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work."

The question as to which employer, the general or the one employing from him, is responsible for the acts of a servant, seems to have been first considered in *Laughor v. Pointer, supra,* where Littledale, J., in the course of an opinion, to which little has been added in subsequent decisions, said: "Houses and land come under the fixed use

and enjoyment of a man for his regular occupation and enjoyment in life. The law compels him to take care that no persons come about his premises who occasion injury to others. The use of a personal chattel is merely a temporary thing, the enjoyment of which is, in many cases, trusted to the care and direction of persons exercising public employments, and the mere possession of that, where the care and direction of it is intrusted to such persons, who exercise public employments, and in virtue of that furnish and provide the means of using it, is not sufficient to render the owner liable. Movable property is sent out into the world by the owner to be conducted by other persons. The common intercourse of mankind does not make a man or his own servants always accompany his own property. He must, in many cases confide the care of it to others who are not his own servants, but whose employment it is to attend to it. And in the instance of various kinds of carriages, they are frequently, in the common intercourse of the world, confided to the care of persons, who provide the drivers and horses, and it is not considered that the drivers necessarily belong to the owner of the carriage. And I think that there can not be any difference, in point of law, as to the liabilities of these persons arising from the mere ownership of the carriage, and that the ownership of the carriage makes him no more responsible than it would do if it had been sent to be repaired by a coachmaker who, in the course of repair, had occasioned any damages to other persons; but, if the injury arises from the driver, it is he, or the person who appoints him, that is to be responsible."

In *Quarman v. Bennett,* 6 M. & W. 497, it appeared that the defendants, two ladies, who kept a carriage, had been for a period of about three years, in the habit of hiring for the day or for the drive horses and a coachman from a job mistress. They had during that time always been driven by the same coachman, to whom they paid a

small gratuity for each drive.  Owing to the negligence
of the coachman for leaving the horses unattended when
the carriage was standing at the door of the defendants'
house, the horses started off and came into collision with
the plaintiff's chaise.  The Court of Exchequer set the
verdict against the defendants aside and held that the
coachman was not their servant, following the opinion of
Littledale, J.  Baron Parke, after pointing out that it was
not material that a particular driver was requested or
usually drove for defendants, or that they furnished the
livery he wore, said: "Upon the principle that *qui facit
per alium facit per se,* the master is responsible for the
acts of his servant; and that that person is undoubtedly
liable who stood in relation of master to the wrongdoer—he
who had selected him as his servant, from the knowledge
of or belief in his skill and care, and who could remove
him for misconduct, and whose orders he was bound to
receive and obey.  And whether such servant has been
appointed by the master directly, or intermediately through
the intervention of an agent authorized by him to appoint
servants for him, can make no difference."  This decision
has been followed in England and in this country since.
*Joslin v. Grand Rapids Ice Company,* 50 Mich. 516 (15
N. W. 887, 45 Am. Rep. 54); *Frerker v. Nicholson,* 41
Colo. 12 (92 Pac. 224, 13 L. R. A. (N. S.) 1122) (cases
collected in notes), 14 Am. & Eng. Ann. Cas. 730; *Little
v. Hacket,* 116 U. S. 366 (6 Sup. Ct. 391, 29 L. Ed.
653); *Driscoll v. Towle,* 181 Mass. 416 (63 N. E. 922);
*Fenner v. Crips,* 109 Iowa, 455 (80 N. W. 526).

In *Stewart v. California Improvement Co.,* 131 Cal.
125 (63 Pac. 177, 724, 52 L. R. A. 205), the city of
Oakland hired a steam roller of defendant for use in level-
ing a street under the direction of the superintendent of
streets.  Plaintiff was injured on account of the negligence
of the engineer in letting off steam and frightening plain-
tiff's horse.  The court, in holding the company liable, said:

"One who should hire a hack and driver from a carriage company and in the use thereof should direct on what streets to drive, where to go, and when to stop, and in fact have the entire control of the movements of the carriage, would not thereby become liable for the damages resulting from the negligence of the driver in the management of the team. The driver is hired by the carriage company, presumably for his fitness in the line in which he is employed, the same as was the engineer in this case by the California Improvement Company. If damages accrue through his negligence or carelessness, such company is liable, and not the one who may have hired and used the carriage. . : . The test in all these cases is: Who conducts and supervises the particular work, the doing of which, or the careless and negligent doing of which, causes the injury or damage Here the city simply hired the use of the street roller outfit from the defendant company, to wit, the roller, engine, and the engineer to manage the same, for so much a day. The city's agent, foreman, or street superintendent only directed or supervised how and where the street should be rolled. He did not have the control or management of the engine. This was subject entirely to the judgment of the engineer, the servant of the owner, the defendant company, who had selected and employed him for that special purpose, paid him his wages, and had the sole right to discharge him. We think the conclusion of the law, deduced by the court below from the facts found, that the defendants are liable, and not the city of Oakland, is correct."

The principle was well stated by Campbell, J., in *Frerker v. Nicholson,* 41 Colo. 12 (92 Pac. 224, 13 L. R. A. (N. S.) 1122): "In the case at bar the negligence relied upon was that of the driver, the servant of defendant. The undertaking company hired of the defendant a carriage, horses, and driver, and exercised no control whatever over the driver further than to tell him in a general

way to drive to the cemetery and return the occupants of the carriage to their homes. The defendant, and not the hirer, exercised control over the driver in the mode and manner in which the latter performed the service. The defendant, and not the hirer, employed the driver, and the defendant was the only one who had power to discharge him or direct his movements. In such circumstances it is unquestionably the law that the owner, and not the hirer, is liable in damages for injuries which result to the occupants of a carriage as a result of the driver's negligence."

These decisions and others, though differing in their facts, fully establish the principle that the owner of the team is responsible for the negligent conduct of the driver where such team and driver have been let to the use of another to do certain work in the performance of which the driver in the

4. SAME: negligence of driver of team: liability.

management of the team is not under the control of the hirer. He may be directed by the latter to drive over a particular way or to haul a specified load; but, if left to drive the team in the manner of his own choosing or as directed by the owner of the team, the hirer is not chargeable with his negligence in improperly handling the team. Thus, in *Delory v. Blodgett*, 185 Mass. 126 (69 N. E. 1078, 64 L. R. A. 114, 102 Am. St. Rep. 328), it is said: "The circumstances are often such that, while the driver is the servant of the person to whom the team is furnished in reference to the question what he shall do or where he shall go, there is an implication that, as to the particulars of the management of the horses, he is the servant of his general employer in whose interest and as whose representative he will manage and direct, within reasonable limits, such matters as pertain to the health and safety of the horses and the safety of the vehicle. In these particulars, for the preservation of his property, it will be presumed that the owner of the team retains in his driver a right of control."

As observed by Holmes, J., in *Driscoll v. Towle,* 181 Mass. 416 (63 N. E. 922): "In such cases the party who employs the contractor indicates the work to be done, and in that sense controls the servant as he would control the contractor if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does their business in his own way, and the orders which he receives simply point out to him the work he or his master has undertaken to do. . . . In cases like the present, there is a general consensus of authority that, although a driver may be ordered by those who have dealt with his master to go to this place or that, to take this burden or that, to hurry or to take his time, nevertheless, in respect to the manner of his driving and the control of his horses he remains subject to no orders but those of the man who pays him. Therefore he can make no one else liable if he negligently runs a person down in the street."

A case much like that at bar was *Huff v. Ford,* 126 Mass. 24 (30 Am. Rep. 645). The defendant therein kept horses and wagons for hire and let the horse and wagon in question to the city of Boston and furnished a driver by the day. The outfit was under the direction and control of the city as to where to go and where to unload and what to do in the performance of the work of paving. The driver, who was employed by the week by defendant, had the entire management of the horse, selected the route to travel, and fed and cared for the horse at defendant's barn, and it was his business to see that he was properly shod. A large plate glass window was broken by the horse kicking a loose shoe through it after he had been violently struck twice by the driver. The defendant, rather than the city, was held liable for the negligence, if any, of the driver in the manner of driving and shoeing the horse.

In *Morris v. Trudo,* 83 Vt. 44 (74 Atl. 387, 25 L. R. A. (N. S.) 33), Lavalley, in the performance of his duty

as acting superintendent of streets of the city of Vergennes
to hire men and teams for the prosecution of the work,
hired of defendant a double team with a driver. By the
terms of the employment, the driver was to do with the
team whatever work he was set to do by Lavalley—whether
moving stones, or using a scraper, or drawing gravel. In
drawing gravel, it was for Lavalley to direct where the
gravel should be taken from, where it should be unloaded,
and how it should be placed. The plaintiff, at Lavalley's
direction, was assisting the driver in shoveling out a load
of gravel, when the team, through the driver's neglect,
started and caused him to fall. The court, in holding that
the owner of the team, rather than the municipality, was
negligent, said: "The precise question is whether or not,
though the team and driver had been temporarily hired out
by the defendant, the driver, in the specific detail of man-
aging or handling the team, remained the servant of the
defendant of whom the team was hired. One to whom the
servant of another is temporarily lent or hired has, for
the time being, the responsibilities of a master in so far as
he may exercise the authority of a master. . . . If
the driver's carelessness resulted in injury to plaintiff,
the doctrine of *respondeat superior* fastens liability upon
the defendant, since the negligent wrongdoing inhered in a
thing in respect to which the relation of master and serv-
ant between him and the driver had never been suspended.
In doing an act one can not be the servant of both a gen-
eral master and a temporary master. But he may at the
same time be the servant of his general master in the
doing of certain acts and the servant of a temporary master
in doing certain other acts. If the contract had been
such that Lavalley might have put a driver of his own
choosing in charge of the team, and have put the driver
furnished at some other work, the defendant would be held
to have relinquished the rights of a master, and to have
been freed from responsibilities as such in all respects.

Such a contract, however, the evidence does not tend to . show."

On no theory, save that Cruse in the handling of the team was acting for defendant, can it be said that the latter is responsible for his act in allowing the horses to stand unhitched at a place where likely to be frightened by a falling plank. But he was intrusted with the team by Mrs. Wright, rather than the defendant; she only might discharge him as the driver of the team. All three from long custom had recognized Cruse's right to handle and control the team, and we are of opinion that therein he was not acting as the servant of defendant. Decisions reaching another conclusion will be found to differ radically in the facts on which based. Thus in *Brown v. Smith,* 86 Ga. 274 (12 S. E. 411, 22 Am. St. Rep. 456), the owners of a team of mules let them with their driver to work for one Dixon, and as the latter was given full control over both, with authority to discharge the driver and substitute another, he, and not the owners, was held to be responsible for the driver's negligence. In *Jones v. Scullard* (1898) 22 B. 565, the defendant was being driven in his brougham, when the driver lost control of the horse, and it bolted into the window of plaintiff's shop doing considerable damage. The vehicle, harness, and horse as well as the livery worn by the driver, belonged to defendant; but the driver was in the employment of one Walker, a livery stable keeper at whose stable defendant kept the brougham and horse. The horse had been purchased recently, and owing to circumstances unnecessary to relate, the question as to the driver's negligence was left to the jury; but Lord Chief Justice Russell, after reviewing previous decisions, held the defendant liable, distinguishing the case from *Quarman v. Bennett, supra,* by saying: "The materiality of the ownership of the horse lies in this: So long as the hirer contracts with the livery stable keeper for the supply of a complete equipage to drive him by the day or hour, as

the case may be, and the stable keeper in pursuance of that contract supplies carriage, horses, and the man to drive them, the hirer has no control whatever over the driver except so far as he can indicate the direction in which he wishes to be driven.   He could not order him to increase his speed, for the driver might lawfully refuse to do so on the ground that he was acting under his master's orders in driving slowly.   But where the hirer of the coachman is himself the owner of the horse, he is entitled to dictate to the driver as to how fast he shall drive, and the driver is bound to take his orders from him.   The driver is, in that case, under the control of the hirer as to the manner of his driving.   Then comes the further consideration that the horse was one which had only come into the possession of defendant a few days before the date of the accident, and had been driven by Loveday an insufficient number of times to enable him to learn the peculiarities of the horse's temper and the manner in which, having regard to that temper, the bit and reins were required to be adjusted.   Further, although the defendant could not dismiss Loveday from Walker's employment, he could, if dissatisfied with his manner of driving, refuse to be driven by him."

In *Howard v. Ludwig,* 171 N. Y. 507 (64 N. E. 172), truckmen furnished defendants each day with a truck, horses, and driver.   There was testimony on the part of the defendants that the truckmen were to deliver all their Staten Island sales for $30 per week, and that for every truck used by defendant for deliveries in New York he should pay $5 per day, and, if packages were lost, the truckmen should be responsible for them.   In behalf of the truckmen, the testimony tended to show that, in case there were no deliveries for Staten Island, the defendants should use the man, truck, and team for their New York deliveries. On the truck used was printed defendants' name, and they paid the ferriage in going from New York to the island. The majority of the court, in disposing of the case, said:

"If, as claimed by the defendants, the contract was that the express company was to deliver all of the goods sold by the defendants on Staten Island each week for $30, and the company was to be responsible for the goods if lost, then unquestionably the defendants would not be liable in this action. But if, instead thereof, the arrangement was that the defendants should pay $30 a week for the team, truck, and driver, and they took charge of the delivery of the goods, sending the team to Staten Island, or around New York, making deliveries, as the exigency of their business required, then the relation of master and servant was created between them and the driver, and they became liable for his negligent acts. Our examination of the testimony bearing upon this branch of the case has led us to conclude that a question of fact arose, which it was necessary for the jury to determine, and that therefore the trial court committed no error in submitting the case to the jury." Three of the judges dissented, however, and speaking through Parker, C. J., said, after stating the facts more fully: "It would seem as if authorities were not needed to support a proposition that, if a man hires out his horses and wagon and driver to another for a special purpose for a day or a week or a month, the driver does not cease to be his employee and become the employee of the hirer, any more than the horses and wagon cease to be his and become the property of the hirer, and that if an express company undertakes to do some or all of the business of a large establishment at a given price per parcel, or at an agreed sum per week or month, its employees do not cease, by operation of law, to be its employees upon commencement of the work, and become the employees of the hirer when the express company still pays them, and continues responsible for their care of the hirer's goods."

But facts of the case at bar do not bring it within the rule announced by the majority even for there defendants might have been found generally to have used and con-

trolled the truck and driver in distributing goods in New York under their direction, while here it affirmatively appears that the driver in managing the team was not under the direction of the lumber company, and more, that it was without right to direct him in such management.

Nor does it appear that the men in the car were negligent. It was not the duty of either to take hold of the end of the plank until it was inside of the car door, and, though one was shown to have stood near by, it was not made to appear that he was aware that the end had caught on the door frame, or that he might have seized it before Cruse threw it up in his attempt to loosen it. There being no evidence tending to show the defendant guilty of any want of ordinary care, the trial court rightly directed the jury to exonerate it from the charge of negligence.—*Affirmed.*

5. SAME: negligence of employees: evidence.