HARLEY LIND, Appellee, v. EUGENE EDDY et al., Appellants.

No. 46129.

NOVEMBER 24, 1942.

REHEARING DENIED MARCH 12, 1943.

T. J. Mahoney, of Boone, for Eugene Eddy and Wesley Todd; Hallagan, Fountain, Steward & Cless, of Des Moines, for Hallett Construction Company, appellants.

Doran, Doran & Doran, of Boone, for appellee.

STIGER, J.— Appellants Eddy and Todd were minors and were represented throughout the trial by T. J. Mahoney, guardian ad litem.

During the summer of 1941, highway 169 was paved from Ogden south for a distance of six miles. The pavement was completed on July 22d and opened to the public generally on August 25th. The accident occurred about noon on August 14, 1941, at which time the highway was being used by the public "quite a bit" though "road closed" signs were at the north and south ends of the new pavement. Appellee was an employee of the Green Construction Company, which had the grading and finishing contract, and at the time of the accident was shoveling dirt on the east side of the pavement where he was struck by a northbound truck driven by defendant Todd at a speed of forty to sixty miles per hour.

Hallett Construction Company operates a gravel pit located about two miles west of Boone and at the time of the accident had sold gravel to the paving-contractors, Booth and Olson, at a price that included delivery at Perry, which is southwest of Boone. Appellant Eddy was engaged in a general trucking business and for some time prior to the accident owned and operated two trucks. One of the trucks was driven by his father until a day and a half prior to the accident, when Eddy employed Todd

as a driver. About a week before the accident, Eddy started hauling gravel for the Hallett Construction Company from its gravel pit to Perry. He was paid by the ton. He paid all operating expenses of both trucks. The amount of gravel per load, the number of loads, and hours worked per day, the speed and manner of driving the truck, the route to Perry, the manner of unloading the truck were left to the determination of Eddy. The company was interested only in having the gravel delivered at a designated place at Perry. Eddy was not subject to the orders of the construction company as to how he should deliver the gravel to its representative at Perry, and was clearly an independent contractor. Burns v. Eno, 213 Iowa 881, 240 N. W. 209; In re Estate of Amond, 203 Iowa 306, 210 N. W. 923; Norton v. Day Coal Co., 192 Iowa 160, 180 N. W. 905; Ash v. Century Lbr. Co., 153 Iowa 523, 133 N. W. 888, 38 L. R. A., N. S., 973.

Though appellee alleged in his petition that Eddy was an employee of the construction company and sought to have him respond in damages on the sole ground that he consented to the use of his truck by Todd, we have determined the true relationship between Eddy and the construction company because the question of independent contractor is referred to in the instructions and repeatedly considered in arguments of counsel.

I. We will first refer to the appeal of Hallett Construction Company. Appellant's motion for directed verdict on the ground that Todd was not its employee should have been sustained, because in fact Todd was the employee of the independent contractor, Eddy.

Appellee claims the following facts show Todd was an employee of the construction company, or at least warranted the submission of the question to the jury:

After Eddy had been hauling gravel a few days he asked the company if he could put his other truck on the job. An employee told him to "bring it down and put her to work." His father hired Todd to drive the second truck. "My father hired him [Todd] for me. * * * My father made arrangements with Todd to drive my truck for me. * * * I was the one that was to pay him for his work. * * * I had my dad employed to drive the other truck prior to that. * * * I knew Wesley was

driving my truck. * * * I told these gentlemen [construction company] that my father had hired Todd to operate this truck.''

Appellee relies especially on the following testimony of Todd to establish his contention that he was an employee of the construction company:

Direct examination.

''When I went on the job that morning I drove this truck back under the dump there where the gravel was let into the truck.

''When I drove away from the loading chute there I went up to the scale house and gassed up and then they told me where to go. The fellows in the scale house told me where I was to go. He said I was supposed to take it to Perry. Q. Did he tell you how to get to Perry? * * * A. Well, they just told me to leave the plant and go to Ogden, and he just said go to Perry, and I had been down that way so I asked him if I was supposed to go out on the highway and he said yes, and I says, 'How, am I supposed to do that?' and he says, 'There will be two oil stations, one on the northeast corner and one on the southwest corner, and just turn there and go south.' * * *

''I knew the road that he indicated from the description of the oil station I was to turn south on. I had been up there. I later found out it was 169, but at that time I wasn't sure if it was 169 or not. That was the road in hauling this gravel from the plant here in Boone County to the job in Perry over which I traveled for the day and a half there. * * *

''They told me I was supposed to take it to Perry and drive into Perry on the highway that would be going west and drive right down the main street of the town and a fellow there would meet me in a '36 or '37 grey V-8 coupe and instruct me where to dump the gravel. * * *

''I went down, and when I went down there then I went back a block north looking for this fellow. I never found him. I waited until Mr. Eddy came along and I told him what was the matter, and he said come with him. He knew where I was supposed to go, so I followed him out and apparently from what has been said he went out to Booth and Olson's and I dumped the gravel there. That was my first load. * * *

1332

"Q. Did you get straightened out on your second load where you were to deliver the gravel according to the instructions you received from somebody down at the plant? A. These other four fellows [other truckers] told me where to go so I fell in line with them. They knew where to go. They had unloaded one load. * * *

"I just went into the scale house and they weighed me out again and we was all hauling the same kind of gravel and they was the only two and they said they had already been hired for that road and they went up and they had loaded out and they was hauling the same place I was so I followed them on down and unloaded too. * * *

"I don't know who it was at the plant who told me to look for the fellow in the Ford V-8 grey coupe."

Cross-examination.

"When I went down there to Hallett's for my first load and loaded up, they just told me to load first and I went and loaded. I was told by Mr. Eddy to go down there that morning so I went in the scale house and asked them what I was supposed to do. They said 'Drive on the scales and we will weigh your truck out right now.' When Mr. Eddy sent me down there, he didn't tell me where this gravel was to be taken to, so when I got down to Hallett's I didn't know where this gravel was to be taken so I asked the fellows in the scale house where it was to be taken before I left. They told me it was to be taken to Perry. I didn't know exactly where it was to be taken in Perry until they told me the place. I dumped the load down in the west part of the town of Perry. I didn't know where that place was unless somebody told me or showed me. Eddy took me out to the place. I was told there at the Hallett place that someone down there at Perry would show me where to take it. * * *

"I first talked to Eugene Eddy about this down at the plant. He was there that morning when I got there so I went over—I knew him, so I went over and talked to him. I had taken the truck down there. I got the truck over at Eddy's house. * * *

"I didn't know just how to get to Perry so I asked them and they said to go over just east of the business district and

there will be two oil stations there. They just told me to go over to Ogden east of the business district and there will be an oil station; on one side there will be an eagle setting there and a station on the southwest corner, and turn and go there.

"I didn't know how to get to Perry and I inquired and they told me the road."

·A slip was given Eddy and Todd at the scale house by the construction company, showing the weight of the load of gravel, and the slip would be delivered to the representative of the company at Perry who would tell them where the gravel was to be unloaded.

Obviously, the information given Todd at his request by the employee of the company did not create the status of an employee of the company. The company did not have or seek to exercise any control over the physical conduct of Todd. It is quite apparent from this record that Todd was an employee of Eddy and not of the Hallett Construction Company. In McDonald v. Dodge, 231 Iowa 325, 330, 1 N. W. 2d 280, 283, Mr. Justice Garfield, speaking for the court, said:

"The control necessary to render a subordinate an employee must be authoritative control as distinguished from mere suggestion or cooperation as to detail. * * * Suggestions similar to that made by appellee are frequently given by a principal to an independent contractor without changing the legal status of the parties."

II. Appellant Eugene Eddy filed a motion for directed verdict on the ground that, though Todd drove his truck with his consent, he is not liable as owner of the truck for the negligence of Todd in which he did not participate, because he is a minor. This motion was overruled. We are of the opinion that the motion was properly overruled.

.As stated, appellee alleged that Eddy and Todd were employees of the appellant construction company and sought to recover against Eddy as owner of the truck solely under the provisions of section 5037.09, Code of 1939, which reads:

"5037.09 Liability for damages. In all cases where damage is done by any car by reason of negligence of the driver, and

driven with the consent of the owner, the owner of the car shall be liable for such damage.''

Appellee's position is that it was the intention of the legislature in enacting the statute to impose an absolute liability on the owner of a car ''irrespective of his age, legal disability or for any other reason.''

We are not in full accord with appellee's statement, as we have recognized that there may be exceptions to the broad statutory provision that the owner shall be liable in all cases, among which are Bateson v. Marshall County, 213 Iowa 718, 239 N. W. 803; Maine v. Maine & Sons Co., 198 Iowa 1278, 201 N. W. 20, 37 A. L. R. 161. Nor would an owner be liable who was incapable of consenting to the use of his automobile by another. However, we agree with appellee's contention that appellant Eddy cannot successfully interpose his defense of infancy in this case.

Section 5037.09 provides that in all cases where damage is caused by a car by reason of negligence of the driver, the owner shall be liable for such damage if it was driven with his consent. The statute recites no exceptions. The language is clear, definite, and unqualified. Appellant Eddy was legally capable of consenting, and did consent, to use of his truck by Todd.

Appellant Eddy contends that the statute created the relation of principal and agent between him and Todd and that he had a right to disaffirm the contract upon attaining his majority, the effect of the disaffirmance being to render the agency contract void ab initio, the parties being restored to the status they would be in had the contract not been made, citing Maine v. Maine & Sons Co., 198 Iowa 1278, 201 N. W. 20, 37 A. L. R. 161; Tigue Sales Co. v. Reliance Motor Co., 207 Iowa 567, 221 N. W. 514; Page v. Koss Constr. Co., 219 Iowa 1017, 257 N. W. 426. It is true that there are statements in the cited cases to the effect that the relationship created by the statute is that of principal and agent. An examination of these cases persuades us that they hold the statutory liability of the owner is analogous to the liability of a principal for the negligent acts of his agent, and do not hold, and do not intend to hold, that the statute creates a full, complete agency relation between the owner and user of the car,

with all the characteristics and legal incidents of such relationship when created by private contract.

In Maine v. Maine & Sons Co., supra, the court, in referring to section 5026, Code of 1924, now 5037.09, Code of 1939, states at page 1282 of 198 Iowa, page 22 of 201 N. W.:

"This statute merely says that the owner of the car shall be liable for the negligence of one who is using the car with his consent. It is a statutory recognition of the present-day frequent use of motor vehicles by others than the owner, where no such relation exists between owner and driver as, under the common law, will create a liability on the part of the owner for the negligence of the driver. The statute defines a new relation or situation of the parties, where a liability on the part of one for the negligence of the other shall exist. * * * The statutory liability depends upon two things: the consent of the owner to the use of the car by the driver, and the negligence of the driver."

Here we have a definite recognition of the obvious intention of the legislature to make the owner liable solely because he is owner of the car. The opinion then makes the following gratuitous statement:

"In effect, it makes the one who uses an automobile with the consent of the owner, the agent of the latter. It may be said to be a statutory extension of the doctrine of *respondeat superior* to a relation to which, under the common law, it did not apply, or to create a liability on the part of one for the negligent act of the other, analogous to that expressed in that phrase."

In Tigue Sales Co. v. Reliance Motor Co., 207 Iowa 567, 573, 221 N. W. 514, 516, the court said that it was not necessary for plaintiff to establish the fact that the driver of the car was in the employ of the owner or was its agent or in the transaction of its business and that it was only essential that plaintiff establish by preponderance of the evidence "that the Reliance Motor Company was the owner of the Hupmobile which caused the damage, and that the motor company had given its consent, at the time in question, for it to be operated by the driver Swearingen."

In Seleine v. Wisner, 200 Iowa 1389, 1392, 206 N. W. 130, 131, we said with reference to the statute:

"The liability depends upon two things: the consent of the owner to the use of the car by the driver, and second, the negligence of the driver. Maine v. Maine & Sons Co., 198 Iowa 1278."

In Page v. Koss Constr. Co., 219 Iowa 1017, 1027, 257 N. W. 426, 431, it is stated:

"The petition is based upon the rule of common law that a principal is liable for the acts of his agent while the agent is engaged in the course of his employment, whereas the cause of action alleged in appellee's amendment is based upon a statutory liability found in section 5026 of the Code."

If the legislature, in enacting the statute, intended to create an agency relation, the borrower or user is an agent only in the restricted sense, to the limited extent that the owner is liable for the damage done by his car through the negligence of the driver. It was unnecessary for the cases to discuss or resort to the law of agency or the doctrine of respondeat superior in construing and applying this statute. The owner was made liable by legislative fiat in cases where no agency, master and servant, or other relationship existed through which the negligence of the driver could be imputed to the owner.

Appellant Eddy is liable for his own torts. Having consented to the use of his car by Todd, he cannot avoid this statutory liability for the latter's negligence because of the limited agency this court has held the legislature intended to create in enacting the statute.

III. Appellant Todd moved for a directed verdict on the grounds that appellee failed to prove any negligence on his part that would be the proximate cause of appellee's injuries and that appellee was guilty of contributory negligence as a matter of law. We are satisfied that both motions were properly overruled by the court. This appellant complains of certain instructions. Assuming error in the instructions, they are not prejudicial to this appellant.—Affirmed in part; reversed in part.

WENNERSTRUM, C. J., and OLIVER, GARFIELD, MILLER, HALE, and BLISS, JJ., concur.