## CARL SIMMONS, Respondent v. W. E. MURRAY, et al., Defendants, CUDAHY PACKING COMPANY, Appellant.

Kansas City Court of Appeals.    December 5, 1921.

1. **MASTER AND SERVANT: Independent Contractor: Relationship Depends upon Whose Servant Negligent Employee was, Whose Work was Being Done and Who Had Right of Control.** The question as to whose servant a negligent employee was, whose work was being done at time, and who had right of control over him were ultimate determinative matters to be settled by the jury in arriving at a conclusion.

2. ————: **Evidence held Ample to Justify Jury in Finding That Driver at Time of Injury was Servant of Company Hiring Truck.** In a suit against a packing company and another for personal injuries received through the negligence of the driver of a truck hired from owner by packing company for purpose of carrying its employees to and from work, evidence *held* ample to justify the jury in finding that the driver at time of injury was servant of packing company and not of owner of truck.

3. ————: **Independent contractor: The Issue as to Whose Servant the Driver of Truck Was, Was for the Jury.** Where the contract between the owner of the truck and the packing company, whereby the latter obtained the truck and driver to transport its employees to and from work was *oral*, and there was a dispute as to what occurred between them on the subject of a loading man to accompany the truck, and also on the subject as to *who had control* over the driver, the issue as to whose servant the driver was, was for the jury, and as the jury found driver to be a servant of packing company and not of the owner it cannot escape liability on the ground that owner of truck was an independent contractor.

4. ————: ————: **Negligence: Exercise of Right of Control not Conclusive Test as to Whose Servant a Driver of a Truck Was; If Company Hired Truck and Had Right of Control over Truck and Driver, Even Though it Did Not Exercise Control, it is Liable for Driver's Negligence.** Where a company hired a truck to carry its employees to and from their employment it is liable to an employee injured while attempting to get upon the same through

the negligence of the driver in backing the truck from a stationary position, against a trolley pole, if it had the right of control over truck and driver in the performance of the work of transporting its employees, whether it chose to exercise that control or not, although the exercise of control should be considered in determining whether the right of control existed.

5. ——: ——: ——: Supervision of Loading of Truck to Secure Results, but not Means and Method of Performance, Does not Make Truck Driver Servant of One Exercising Such Supervision. Where a company hiring a truck to transport its employees to and from work had supervision of the loading of truck merely to secure results, but the same did not include the means and method of performance, such control over result did not make the truck driver the servant of the company; the control of the workman doing the actual manual labor in the performance of the work being an important element in determining whether the driver of truck was the servant of the owner thereof or of the company.

6. ——: Verdict: A Verdict for One Defendant in Action for Negligence Against Two Defendants Does not Discharge the Other, Particularly Were Defendant in Whose Favor Verdict Was Returned Was not the Immediate Actor for Whose Culpability the Other Defendant is Sought to be Held Liable. Where the verdict in suit for personal injuries against packing company and owner of truck hired by company to transport its employees to and from their employment, was in favor of the owner and against company, the same did not discharge the company, the owner not being the driver, nor the driver the owner's servant while working under the control of the company; the rule contended for applying only where defendant's liability is necessarily dependent upon the culpability of another who was the immediate actor, and who, in an action against him by the same plaintiff for same act, has been adjudged not culpable.

7. Appeal and Error: instructions: Damages: Instructions on Measure of damages omitting to Limit Damages Recoverable to Reasonable Compensation are Erroneous. Instructions on the measure of damages which required jury to consider, in assessing damages, plaintiff's physical pain and mental anguish, the nature, extent and permanency of injuries, lost time, wages and doctor bills, were erroneous as the instructions did not place any limit upon the amount the jury were entitled to award, the plaintiff being entitled only to reasonable compensation, and the jury not being entitled to award any amount they pleased, but must be governed by reasonable values.

ON REHEARING.

8. ———: Instructions Which Failed to Limit Plaintiff's Damages to Such Sum as Would Reasonably Compensate Him Was not Mere Non-direction but Amounted to Mis-direction and Were Erroneous. Where instructions on measure of damages are not attacked on the ground that they permit jury to consider elements of damages not recoverable but because the instructions permit jury to allow any amount of damages that they in their fancy might see fit to allow, and jury proceeded to allow an excessive amount, the instructions were erroneous and the burden was not upon the defendant to ask an instruction limiting the amount of recovery, as the plaintiff's instructions were not mere non-direction but amounted to mis-direction.

Appeal from the Circuit Court of Jackson County.— *Hon. Allen C. Southern,* Judge.

REVERSED AND REMANDED.

*J. K. Cubbison* and *Wm. G. Holt* for respondent, Simmons.

*McFadden & Claflin, New, Miller, Cammack & Winger,* and *S. J. McCullough* for appellant, Cudahy Packing Company.

TRIMBLE, P. J.—Plaintiff, an employee of the defendant Cudahy Packing Company, while being carried to his work in a truck furnished by said defendant, but owned by the defendant Murray, was injured by the negligence of the truck driver, and brought this suit for damages against both the Company and the owner of the truck. Defendants each filed separate answers denying generally and pleading contributory negligence; and, in addition thereto, defendant Murray set up that the driver of the truck was not, at the time and place of the injury, his, Murray's, servant but was the servant of the Cudahy Packing Company; while the latter, after denying that plaintiff was in its employ at the time and place, set up that, if plaintiff was injured at said time

and place, which the Company denied, his injuries, if any, were occasioned by the carelessness and negligence of the servant of defendant Murray and that Murray was an independent contractor, engaged in the work of transporting to the defendant's place of business such persons as desired to enter the employ of the Company and to work for it.

A trial was had and the jury returned a verdict for plaintiff against the Cudahy Packing Company in the sum of $3000, but found a verdict in favor of the defendant Murray. Whereupon the Cudahy Packing Company filed motion for new trial which the court, after requiring plaintiff to file a remittitur of $1000, over-ruled. Thereupon said defendant appealed.

Plaintiff worked for the packing Company from some time in 1917 up until he was injured as hereinafter set forth, which injury occured between 7 and 8 o'clock on the morning of January 10, 1919.

At the time of the injury, a strike of the employees on the Kansas City street railway was in progress and this impeded the packing company's work because it interfered with the employees' getting to and from the plant. For the purpose of avoiding that interference the company undertook to furnish transportation to the employees by using trucks to carry the employees to and from their work. They were not taken to and from their respective homes, but in the morning the employees would be met at three designated points in the city and were conveyed from thence to the plant, and in the evening the trucks took them from the plant to said different points from whence they would go to their respective homes. One of these points, at which employees would in the morning be afforded an opportunity for such transportation, was at 15th and Walnut streets. In the evening the employees would be told where they could find a truck the next morning. And the evening before the injury plaintiff was told to be at 15th and Walnut the next morning and a truck would be there for him.

The next morning the truck on which plaintiff was injured was standing at the northeast corner of said street intersection and was facing north. The truck was one having a bed which flared out at the top and on each side of the truck there were seats improvised, running lengthwise. When plaintiff arrived at the truck it was practically filled with employees, there being only room for one more person on the rear end of the seat on the east side, and plaintiff climbed over the endgate at the rear and was in the act of sitting down when the driver backed the truck. He did this in order to turn around and go south over a near route to the plant. Plaintiff, in taking his seat, had to take hold of the top of the end of the bed with his hand, there being nothing else to hold to in order to obtain his position and balance on the seat. The truck was standing still when he thus took hold of the bed, but immediately thereafter and while he was in the act of seating himself the truck backed, as before stated, going only two or three feet when it struck against an iron trolley post at the curb, catching plaintiff's index finger between the post and bed and mashing it so nearly off that it had to be amputated.

Appellant's first contention is that Murray was an independent contractor and hence that the driver of the truck was not its servant but was Murray's.

In order that the situation and relations existing between the said parties may fully appear, we here set forth the evidence bearing upon this question of whose servant the driver was.

Defendant packing company, during the strike on the street railway, was using five of its own trucks—all it could spare from it packing business—in conveying its employees to and from its plant, but, not having enough trucks which could be devoted to that purpose, it telephoned to Murray and said they "wanted to engage trucks for hauling their employees." Murray told defendant that he usually sent two men with a truck, but defendant said it wanted only a driver with each

truck. Murray thereupon told defendant his price for a truck and one man was $3 an hour, and defendant company told Murray to send the trucks to them and he sent three trucks, each with a driver. He testified that he "just ordered the trucks to their (the Cudahy) plant" and had nothing to do with the trucks after that. During the time they were employed and used by the packing company they were not used by Murray but were at the services of the packing company. Murray did not know where the trucks were to go, that is, the streets they were to travel on nor the points they were to go to, though he did know the purpose for which they were desired.

The driver of the truck testified that all the instruction he got from Muray was to report at Cudahy's plant, and that he would get instructions from them. When he got to the plant he was told the Company wanted employees hauled back and forth; that at the designated points in the city to and from which the employees would be hauled, they "the Cudahy people" would have a man to see that it was Cudahy men and not other fellows loaded on the truck, and that in case of accident he was to report to them, the Cudahy Company; that in the evening when he would start out from the plant with a load a man there at the plant would tell him to return and if they had any more to haul he would tell him where to take them, and finally when there were no more to haul, he was told to be at a certain point next morning to bring whoever of the employees were there to the plant; that at the plant there were big stationary steps provided by the Cudahy Packing Company to which the trucks backed up for the purpose of enabling the employees to board them, and the Cudahy Packing Company also provided certain steps to go with each truck for loading and unloading purposes at the designated points aforesaid; that in the evening at the plant, when the employees were being loaded into the trucks, a man was there directing the loading, telling the employees which truck to get into in order to go to the

point nearest their homes; that when the truck was loaded, this man would say to the driver to "take this load of people" to a certain one of said points and would tell him the better way to get to that point; that in the morning, at the loading point, there was a man in charge of the loading, but not the same man every time; that the driver did nothing but drive and the man in charge of the loading took care of the truck steps by putting them into the truck after it had obtained its load; that on the morning of the accident the man who supervised the loading and who gave him the signal to start was a man whom he had seen at the plant directing the loading there.

The truck was one used in a general trucking business, but when it was devoted to hauling men and women back and forth, the Cudahy Packing Company put seats in it, long benches extending lengthwise of the truck, one on each side. The defendant also put a banner on each side of the truck over Murray's name thereon, said banner having on it in large letters "Cudahy Employees." As heretofore stated defendant paid Murray $3 per hour for the truck and driver, and the driver's salary was paid by Murray.

The defendant's evidence denied that it told Murray it would have a man to attend to the loading and unloading; and denied that it had any control over Murray's drivers. Its evidence admits that the assistant foreman, Higgins (and when he was not there Mr. Reidy acted in his place), was at the plant in the evenings overseeing the loading of the trucks, but it contends that all they did was to tell the employees where the different trucks were going; that they did not issue any directions to the drivers except to tell them to what points they should take their loads from the plant, but not as to *how* they should operate them or the *route* they should take. As to the loading of the employees in the evening at the plant, the assistant superintendent said "Of course, we handled that at the plant." But it was denied that any-

one with authority from the company had charge of loading the trucks in the morning at the points designated, by the company the night before, to the employees as to where they would find a truck for their accomodation. The assistant foreman said that on several occasions he had told the drivers to make reports to the plant of all accidents and "To be careful—always to be careful driving out there, on account of the people—not as to loading people on the trucks, of course we handle that at the plant."

He further testified that they used possibly as many as five of their own trucks in hauling people, but used hired trucks mostly for the reason that their trucks were engaged in hauling meats; that the only general instructions, given to the drivers of the Company trucks as well as to the hired trucks, was to take the loads of people to a certain one of three points and to be at a certain one of those points the next morning; that the hired truck drivers were give the same instruction as the Company's own men; that the trucks were handled and operated exactly the same as the Company's trucks; that the trucks had the same shape, bed, and build but possibly the Company's trucks were a little heavier; that the trucks were equipped alike with long seats on the side, and these seats were provided by the Company, but that it did not supply each truck with a portable step as plaintiff's evidence tends to show. It admitted that the hired truck drivers were given the same instructions as their own men; that it sent the trucks to the designated places in the morning to pick up and bring its employees to its plant; that at night the employees would be told at what point to be the next morning to meet a truck, told them "we would have a truck there;" that it was uncertain when the street car strike would end but regardless of that "we didn't take chances on the street cars starting" but each night told the employees to be at certain points the next morning and trucks would be there and they, the company, sent the trucks

there, with flags and banners, and sometimes a streamer on them; that when the hired trucks came to the plant the first day they all reported to him and he put a sign on them and told them where to go.

"Q. You directed the movements of the two sent down by the Murray Transfer Company, they were directed by you after that, what to do, where to go, except you did not tell them what streets to travel? A. Exactly—did not tell them what streets to drive on—told them where the points were.

"Q. The same as your trucks, as far as directions were given, to go to a certain place, get a load and come back? A. Yes, sir."

"Q. You told Simpson and Johnson (the driver of the truck when plaintiff was injured) to be careful, did You? A. On several times, yes, I have talked to them."

"Q. You told your own men to be careful, the same way? A. Yes, sir, told them that all the time."

"Q. You issued the same instructions to all drivers? A. Put a sign on the truck and tell them where to go, what to do, that is to be careful when coming and leaving the plant. We had a narrow place to leave and a narrow place to load.

"Q. You told both Simpson and Johnson to report any accidents, at the plant? A. Told them all to report accidents.

"Q. Just the same as the others? A. Yes, sir.

"Q. Any accidents were to be reported to you? A. Yes, sir.

"Q. They did report this accident to the plant? A. Yes, sir."

The foregoing statement and resume of what is disclosed in the record, and the quotations therefrom, are given more for the purpose of giving as clear a picture of the facts and circumstances which the jury had on

which to decide the question of whose servant the driver of the truck was. They are not set forth on the theory that any one fact settles the matter as to whether Murray was an independent contractor; nor do we mean to imply that every fact we have hereinabove, set forth has a vital and important bearing on that question. Some of them may be mere sidelights on the picture which the jury might possibly have the benefit of in determining *whose work was being done* at the time, and who had the *right of control*. These, we think, are the *ultimate* determinative matters to be settled by the jury in arriving at a conclusion as to whose servant the driver was. In this connection, many things may be entitled to consideration in arriving at the ultimate conclusion, no one of which however may be determinative thereof.

We do not deem it necessary to go into an extended discussion of these various factors which, under the circumstances of this case, the jury are entitled to consider in reaching a conclusion on the question here involved. But the evidence, we think, is ample to justify the jury in finding that the driver of the truck, at the time of the injury, was the servant of the Cudahy Packing Company and not of Murray, and hence, as the jury has so found, the said defendant cannot escape liability on the ground that Murray was an independent contractor. There can be no question but that the issue was one for the jury and not the court, as the contract between Murray and the Packing Company whereby the latter obtained the truck and driver was *oral,* and there is a dispute as to what occured between them on the subject of a loading man to accompany the truck, and also on the subject as to *who had control* over the driver. When such is the case the question is for the jury. [14 R. C. L. 79.]

According to Murray, he merely sent a truck with a driver over to the plant and had no control over it or him as to how or in what way the work should be done. And the jury could find that the *control* over the truck

and driver in the performance of the work (that of transporting the employees), was in the Cudahy Packing Company, and that such work was the latter's work. It is true, defendant denies that anyone, with authority from it, was present in the morning at the designated points, supervising the work, but whether plaintiff's evidence was sufficient to show that whoever did supervise in the morning had authority or not, still the jury could well find that the company had the *right* to control at those times and during the transportation; and whether it chose to *exercise* that control is not the conclusive test. The *right to control* is more vitally important than the *exercise* of that right, though whether defendant exercised control is to be considered in determining where the right to control existed. [14 R. C. L., sec. 3, pp. 67, 68.] Of course, a degree of supervision may exist in the defendant to secure *results,* and where that does not include the *means* and *method of performance,* such control over the result does not make the truck driver a mere servant of the defendant. [14 R. C. L., secs. 4 and 5, pp. 68, 69.] But "the control of the workman doing the actual manual labor in the performance of the work is an extremely important element in determining whether the employee" was the servant of Murray or of the defendant packing company. [14 R. C. L., sec. 8, p. 70.]

In Standard Oil Co. v. Anderson, 212 U. S. 215, the Supreme Court of the United States say that the reason for the rule that the master is liable for the wrongs of his servant is because the latter is doing the former's work and a master is bound to conduct his affairs so that others are not injured; that the ultimate and controlling questions in the determination of whose servant the wrongdoer was at the time of the wrongful or negligent act are: Whose work is being done? And whose is the power of control? And at pages 220, 221, and 225 of the above cited case the Supreme Court say:

"One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiesence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation. It is insisted by the defendant that the winchman, though in its general employ, had ceased to be its servant, and had become for the time being, with respect to the work negligently performed, the servant of the master stevedore. This may be true, although the winchman was selected, employed, paid and could be discharged by the defendant. If it is true, the defendant is not liable."

. . . "It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became *pro hic vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still in its doing his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work."

. . .

"In many of the cases the power of substitution or discharge, the payment of wages and other circumstances bearing upon the relation are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power of control."

Applying these principles to the case in hand, it seems to us that the jury had ample evidence to justify them in their finding. The Supreme Court of Kansas in the case of Phillips v. Armour & Co., 196 Pac. 245, reached a conclusion which upholds the one we have reached.

It is next contended that inasmuch as the verdict was in favor of defendant Murray, this discharges the defendant packing company also. But this overlooks the fact that Murray was not the "immediate actor" for whose culpability the defendant is sought to be held liable. If Murray had been the driver of the truck, then the rule contended for might well apply, for if the driver of the truck was not negligent, then the master of that servant could not be. But if the driver of the truck was not Murray's servant, the verdict was properly in his favor on that account, and not because of there being no negligence on the driver's part. The contention overlooks the ground of the rule contended for, which is that the defendant's liability must be "necessarily dependent upon the culpability of another who was the immediate actor, and who, in an action against him by the same plaintiff for the same act, has been adjudged not culpable." [7 Labott on Mas. and Serv. (2 Ed.), p. 7876, sec. 2564.]

The plaintiff's instruction on the measure of damages were as follows:

"The court instructs the jury that if you find the issues for the plaintiff under the evidence and the instructions of the court, you may in assessing plaintiff's damages, if any, take into consideration the physical pain

and mental anguish, if any, which you believe and find from the evidence plaintiff has suffered as a direct result of his injuries, if any, and you may also take into consideration the nature and extent of plaintiff's injuries, if any, and whether or not any of said injuries, if any, are permanent.''

"You are further instructed that if you find for the plaintiff you may take into consideration in assessing his damages, his lost time and wages, if any, and doctor bills, if any, necessarily incurred in connection with the treatment of his finger, which you may find to be shown by the evidence in the case."

It will be observed that these instructions omit to tell the jury that, if they found for plaintiff, the sum awarded should be only for ''*such sum* as you believe from the evidence *will reasonably compensate* him for such injuries.'' In other words, the instructions do not place any limit on the amount they are entitled to find. The jury are not entitled to award any amount they please, but must be governed by reasonable values. This element is an important feature in every approved instruction on the measure of damages. [McQuillen on Instructions, secs. 1251-1258.] And in cases where criticism of instructions on the measure of damages has been overlooked, the court has done so because of the fact that the instructions *contained* the feature here omitted *and* the verdict was *not excessive*. [Chilton v. St. Joseph, 143 Mo. 192, 203; Young v. Webb City, 150 Mo. 333, 338, 343; Shinn v. United Railways Co., 248 Mo. 173, 183.] In the case at bar, the verdict was, in the opinion of the court, too much by $1000. Nor can we say that had the jury been confined to what would *reasonably compensate* plaintiff the verdict would be as high as $2000, the amount to which it was reduced by the trial court. In Grattan v. Suedmeyer, 144 Mo. App. 719, 726, the court held that the instruction on measure of damages ''should have limited the amounts to such sums as were reason-

able'' and that the instruction was ''erroneous for the *further* reason'' etc., and reversed and remanded the case for the ''errors noted.'' The measure of damages is a question of law and when the court instructs on that, it should instruct correctly. [Fry v. Estes, 52 Mo. App. 1, 7.] Plaintiff's brief, in effect, conceded that the omission to include the above feature in the instruction was error, but says it is not ''material error.'' We do not think the circumstances of this case are such that we can say it was not material. [Smoot v. Kansas City, 194 Mo. 513, 526.] One of the things *present* in the case at bar is a thing the *absence* of which in the case of Winterman v. United Railways Co., 203 S. W. 486, 488, induced the court to hold that the instruction therein criticised was not reversibly erroneous. The feature omitted from the instruction in the case at bar is an essential feature of a correct instruction on the measure of damages, one that should not be omitted and to overlook its omission will sanction and permit procedure in the future that ought not to be, established.

For the error noted the judgment is reversed and the cause is remanded for a new trial. The other judges concur.

## ON REHEARING.

BLAND, J.—We think the conclusion reached on the former submission of the case was correct. The only matter that is now in controversy is, whether there was any error in plaintiff's instructions on the measure of damages. Plaintiff insists that the instructions are proper as far as they went and if the defendant Packing Company was dissatisfied with them, the burden was upon it to request instructions embodying its ideas and views on the measure of damages, which was not done, and that under the circumstances the failure to limit plaintiff's damages to such sum as would reasonably compensate him for his injuries was a mere non-

direction and not a mis-direction. In support of this, plaintiff in his brief on rehearing cites the followng cases;

(1) Minniea v. St. Louis Cooperage Co., 175 Mo. App. 91; in that case the instruction was not on the measure of damages but was one on the matter of plaintiff's contributory negligence; (2) Powell v. Union Pacific Ry. Co., 255 Mo. 420; the instruction in that case on the measure of damages provided that the damages should be "fair and just pecuniary compensation" and it is this feature that is omitted in the instruction in the case at bar; (3) Winderman v. United Rys. Co; this case is disposed of in the opinion on the original submission of the case at bar; (4) Bettoki v. Northwestern Coal & Mining Co., 180 S. W. 1021; the instruction is not set out and it is impossible to tell the exact nature of the generality of its terms.

From an examination of the cases where the instructions on the measure of damages containing general language were approved, it is apparent, we think, that the generality in the instructions was considered from the standpoint that the jury might take into consideration elements of damages that would not be properly recoverable, it being the ruling that if defendant desired the jury to be restricted to the proper *elements* of damages, the defendant should offer instructions to accomplish this purpose. In the leading case of Browning v. Railroad, 124 Mo. 55, 71, the instruction read:

" 'If the jury find for the plaintiff they will assess her damages at such sum as in their judgment will be a fair and just compensation to her for the loss of her husband, not exceeding the sum of $5000.' "

This instruction contained the matter left out in the instruction in the case at bar. It is apparent that the instruction in the Browning case was assailed by the defendant on the ground that it did not limit the jury to the *elements* of damages that the jury should properly consider, for the court said—

". . . 'No attempt was made by it (defendant) to point out the *proper elements of damage* in such cases or to modify the general language of the instruction.

'The instruction is not erroneous in its general scope; and if, in the opinion of counsel for defendant, it was likely to be misunderstood by the jury, it was the duty of the counsel to ask the modifications and explanations, in an instruction embodying its views.

'The court is not required in a civil case to instruct on all questions, whether suggested or not, and as there is nothing in the amount of the verdict to indicate that the jury were actuated by any improper notice in their assessment, the general nature of the instruction is no ground for reversal.' "           (Italics ours.)

In the case of Barth v. Kansas City Elev. Ry. Co., 142 Mo. 535, 555, commenting upon the language of an instruction which was general as to the measure of damages, the court said—

"Subsequently we ruled in the Browning case where the essential *elements* of the damages were given to the jury for the plaintiff in the language of the statute, its generality would not constitute reversible error, reserving to the defendant the right to point out *the elements limiting* the damages in its own instructions." (Italics ours.)

In Harmon v. Donohoe, 153 Mo. 263, the instruction on the measure of damages was very general, more so even than those in the case at bar. While the nature of the attack on the instruction is not stated specifically, it is apparent that it was assailed for the reason that it permitted the jury to take into consideration any element of damage that it saw proper. For the court in discussing the instruction stated that its language was fuller than the instruction in the Browning case. In the instruction in the Harmon case the court laid stress on the fact that the *elements* of damage were specified in the instruction.

In the case of Wheeler v. Bowles, 163 Mo. 398, the language of the instruction was likewise very general.

The court in passing upon the point made against it by the defendant stated, l. c. 409—

"As to this point it is only necessary to remark that this is a civil action and mere non-direction is no ground of error in this court. The defendant did not submit any instruction on the elements of damages, neither did plaintiff. If defendant desired the jury restricted to *certain elements* he should have offered an appropriate instruction on that subject." (Italics ours.)

In Smith v. Fordyce, 190 Mo. 1, 30, the instruction on the measure of damages that was approved was very general in terms, as much so as the one in the case at bar, but it was assailed on the ground that it did not define the *elements of damages* which the jury should take into consideration in arriving at their verdict.

On an examination of the cases passed upon by the Supreme Court involving the generality of the matter of plaintiff's instructions on the measure of damages, it will be found that the question before the court was whether the instruction in a given case was erroneous because it was broad enough to allow the jury to consider elements of damages not recoverable and the instruction was approved on the ground that it was good as far as it went and that if defendant desired the jury to be restricted to the proper elements of damages he should give an instruction limiting them in that way.

The instructions in the case at bar cannot be successfully attacked on the ground that they permit the jury to consider *elements* of damages not properly recoverable and the attack is not on that ground but because the instructions permit the jury to allow any *amount* of damages that they in their fancy might see fit to allow. As was said in the original opinion in this case, the measure of damages was a question of law and when the court instructs on that it should instruct correctly. It is not a question of what *elements* of damages the jury were permitted to consider but one going to the *amount* of the recovery. As to the amount of damages recover-

able the court improperly instructed the jury because the instructions peimit the jury, if it sees fit, to allow more than a reasonable sum to compensate plaintiff for his injuries, and the jury proceeded to allow an excessive amount. The jury were not restricted in any way as to the amount they might find, neither as to the matter of reasonable compensation nor as to the amount asked in the petition. [Spohn v. Mo. Pac. Ry. Co., 116 Mo. 617, 633; 17 C. J., p. 1065.]

Plaintiff's instructions amounted to more than a non-direction, they were a mis-direction. The judgment is reversed and the cause remanded. All concur.