CATHERINE O'BRIEN v. HERMAN RINDSKOPF, Appellant, ROBERT J. AMBRUSTER and CARL KOEHLER.—70 S. W. (2d) 1085.

Division One, April 19, 1934.

1234

*Jones, Hocker, Sullivan, Gladney & Reeder, Web A. Welker* and *Willard A. McCaleb* for Herman Rindskopf; *Lawrence McDaniel* of counsel.

*Eagleton, Henwood & Waechter* for Catherine O'Brien.

*Allen, Moser & Marsalek* for Robert J. Ambruster.

STURGIS, C.—This plaintiff received personal injuries in an automobile collision at the intersection of two streets in Clayton, St. Louis County. She was riding as a guest in an automobile owned and driven by defendant Carl Koehler when it collided with or was run into by a flower truck being driven by one Hilton conveying flowers from a funeral to a cemetery. She was rendered unconscious and knew little as to the accident. Subsequently she ascertained that defendant Ambruster was the undertaker conducting and in charge of the funeral in connection with which the flowers were being taken from the funeral home to the cemetery, but that the flower truck was owned by another undertaker, defendant Rindskopf, and was being operated and driven by the driver Hilton in his general employ for that purpose. Plaintiff thereupon brought this suit to recover for her injuries against all the parties named except Hilton, the driver, to-wit, against Carl Koehler, the owner and driver of the automobile in which she was riding when injured, Robert J. Ambruster, the undertaker in charge of the funeral in connection with which the colliding flower truck was being operated, and against Herman Rindskopf, the other undertaker who owned the colliding flower truck and whose driver was operating the same at the time of the collision. The negligence charged and proven was the negligence of the driver Hilton in so operating the flower truck as to run it against the Koehler automobile in which plaintiff was riding, together with like negligence of Koehler in operating his car. The specific negligence of each was charged to be excessive speed, failure to keep a proper lookout for other cars, failure to stop or slacken the speed, sound a warning, etc. Each of the defendants, Ambruster and Rindskopf, is sought to be held liable as master and therefore responsible for the negligent acts of his or their servant Hilton, the driver of the flower truck, on the doctrine of *respondeat superior*. The trial court heard the evidence, overruled separate demurrers thereto of each defendant, and submitted the case to the jury against

all three. The defendant Koehler denied that he was guilty of any negligence. The jury so found and he drops out of the case. The other two defendants, Ambruster, conductor of the funeral, and Rindskopf, owner of the flower truck and furnishing the driver, while denying that the driver Hilton was negligent, on which point they lost before the jury, fought the case largely on the question of which of them occupied the position of master to Hilton, the driver of the flower truck. That question was also submitted to the jury and it found for defendant Ambruster and against Rindskopf, assessing plaintiff's damages at twenty thousand dollars. In other words, the jury found that it was the negligence of Hilton, the driver of the flower truck, that caused the collision and plaintiff's injury, and that Rindskopf, the owner of the truck, was Hilton's master and responsible for his servant's negligence. From the judgment against him and discharging the other defendants, he has appealed. The plaintiff has also appealed but complains of the judgment only so far as it discharges Ambruster from liability and does not care about that unless this court reverses the judgment as to Rindskopf. The real controversy is between the two undertakers as to which is responsible as master for the negligence of the driver Hilton.

On this appeal the defendant Rindskopf contends that the trial court should have sustained his demurrer to the evidence and directed a verdict for him, but frankly admits that the evidence is sufficient to warrant the finding of negligence on the part of the driver of the flower truck, Hilton, but says that the evidence does not warrant a holding that the relation of master and servant existed between him and the negligent driver. The principal question presented on this appeal is whether the doctrine of *respondeat superior* applies to the appealing defendant, Rindskopf, under the facts here.

On this question there is little, if any, dispute as to the controlling facts. The defendant Ambruster was in the undertaking business and was employed to and conducted the funeral in question, furnishing all the equipment and receiving all the pay. He did not have a flower truck to haul the flowers from the home where the funeral service was held to the cemetery where the body was interred. He supplied that appliance by requesting defendant Rindskopf, who was also engaged in the undertaking business and had such equipment, to send his flower truck and driver thereof to the place of the funeral to be used for that purpose. Both these undertakers belonged to a voluntary Undertakers' Cooperative Association and it was usual and doubtless found profitable for undertakers not to own and maintain all the equipment that was necessary to use in their business, but to order from each other, as occasion demanded, a part of the equipment to be used in conducting a particular funeral. Charges were made and paid at a general uniform rate for furnishing each other

funeral equipment with drivers in charge. No undertaker was under obligation to furnish another any such equipment or service, but it was profitable to each to do so and was a substantial part of the business of each. On this occasion defendant Ambruster, in charge of this funeral, ordered or hired from Rindskopf the use or service of the flower truck and driver for this funeral. Perhaps on the next day Rindskopf would need and order from Ambruster a limousine or a pallbearers' carriage and Ambruster would furnish same and charge for it in the same way. . Each undertaker would get the same price for the use of any of his equipment and driver whether used by himself in his own funerals or furnished to other undertakers. In the one case he would collect direct and in the other case the other undertaker would collect for him.

The negligent driver, Hilton, had been in the regular employ of defendant Rindskopf for eight years at a fixed salary and was perfectly familiar with the business and his duties. When Rindskopf received the order from Ambruster for the use of his flower truck and driver on this occasion, he so informed Hilton and little further direction was made as Hilton knew the location of the funeral home, the cemetery, and what work the flower truck would perform. He put the flower truck in readiness and reported at the place of the funeral. Ambruster, the undertaker in charge, gave him no direction, except to remove the flowers through the side door, as Hilton* already knew just what he was to do and how to do it. Hilton knew that the custom was for the flower truck to wait till the funderal procession left the house on its way to the cemetery and then to gather, up the flowers and take them to the cemetery in time to unload and arrange them at the grave before the funeral party arrived. The undertaker in charge would notice the flower truck when it passed the funeral procession and the rate of speed would be regulated so as to give the flower truck time to pass and reach the cemetery first. No instructions were given by Ambruster or needed by Hilton as to doing this work. He knew what to do and how to do it. The route to be taken by the funeral party to the cemetery was suggested by a police officer present at the time and Hilton got this information in that way. He generally had charge of and drove this flower truck in connection with funerals, whether such funeral was in charge of his regular employer or when his employer directed him to do so, as on this occasion, in funerals conducted by other undertakers. When driving the car in funerals of other undertakers he was, of course, subject to their general directions and instructions in the nature of information rather than as commands.

Ambruster testified that he telephoned Rindskopf to send his flower truck and driver to the designated place for use in the funeral; that Rindskopf did so; that the driver reported at the proper time

and place; that he merely ascertained that the driver was there and knew the route to be taken to the cemetery and directed that the flowers should be removed through a side door. No other directions were given or needed. When the funeral procession had started on its way, the driver Hilton loaded the flowers in the flower truck, started to the cemetery, and on the way the flower truck, due to the driver's negligence, collided at a street crossing with the automobile in which plaintiff was riding and being driven by defendant Koehler. The driver's negligence causing the accident was his too rapid and reckless driving at the street crossing. The only instruction the driver had ever received as to driving was that his employer, Rindskopf, cautioned him on other occasions to be careful as he, Rindskopf, would be liable for any damage he caused; and that this flower truck being a new one, he had told him never to drive it more than twenty-five miles per hour. The evidence for plaintiff was that on this occasion he was driving thirty-five to forty miles per hour. The driver Hilton reported the accident to Rindskopf, but not to Ambruster, and Rindskopf paid for the damages done to his own car. The custom in such cases was that as soon as the flowers were delivered and disposed of at the cemetery, the driver, without more, returned with the truck to the office of his employer, Rindskopf, unless previously directed by him to do other work. The evidence also is that Ambruster expected a competent and experienced driver to accompany the flower truck, yet if he had for any cause concluded that the driver was not competent or not a proper person to do the work, he could have "fired him and the truck off the job," but he could not have discharged him from his general employment or substituted another driver in his place even for this particular trip. The general method of redress in such cases was to complain to the owner of the flower truck or other such equipment and notify such owner not to send the objectionable driver in work to be done for him.

■ The question of liability in this case of either defendant Ambruster or Rindskopf is based on the doctrine of *respondeat superior* as applied to master and servant. Neither undertaker was present at the accident and there was no personal negligence of either. The negligence was purely and solely that of the driver Hilton and if either of the undertakers is held liable it is because he sustained the relation of master to this servant Hilton. Hilton's fast and reckless driving was in violation of the implied, if not express, direction and wishes of both undertakers.

On this appeal the defendant Rindskopf is only interested in our holding that Hilton, the driver, was *not his servant,* and plaintiff is only interested in our holding that, if Rindskopf is not liable because of that relation, the defendant Ambruster is liable. No one contends that Hilton was not the servant of one or the other and we are not asked to hold that he was the servant of both.

The authorities all agree that the relation of master and servant is based on contract, express or implied, and when that relation exists the master is liable in damages to any third person suffering injuries from the tortious or negligent act of his servant. And this is true although the negligent act is contrary to the intent, the wishes and instructions of the master. [18 R. C. L., p. 797, sec. 255.] The basis of this rule expressed by the Latin phrase *"respondeat superior"* is the rule expressed by another Latin phrase, *"qui facit per alium facit per se"* (18 R. C. L. 786), he who does a thing by or through another does it himself; and so if he does a thing through another, his servant, negligently, the negligence is his own. [Flori v. Dolph (Mo.), 192 S. W. 949, 951.]

In this case the general contract of employment was between defendant Rindskopf and Hilton, the driver, and Rindskopf paid all his wages. Hilton did only such work as Rindskopf directed him to do. But the law is that with Hilton's consent, express or implied, Rindskopf, his employer, could so transfer or surrender the service of Hilton to another as to make Hilton the servant, for the time being or for a particular piece of work, the servant of such other, who would become liable for his negligence. [18 R. C. L., sec. 244, p. 784.] "A servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the party to whom he is loaned or hired, and to impose on the latter the usual liabilities of a master." 39 Corpus Juris, 1274, citing Boroughf v. Schmidt (Mo. App.), 259 S. W. 881, 883, and cases from many states. The holding in the case last cited is: "While it is true that one may be in the general service of another, and, nevertheless, with respect to particular work, may be the servant of another, who may become liable for his acts, yet to escape liability the original master must surrender full control of the servant in the performance of said work. The fact that the servant is partially under the control of the third person will not release the original master for any wrongful act done by the servant in the ordinary course of his employment. (Cases cited.)"

The question of who is the master and therefore responsible for the negligent act of the servant is said to be determinable by who at the time has the right to control the acts of the servant causing the injury. The right of control, rather than the fact of control, governs. The question is, who has the right of control and direction and whose work is the servant engaged in, rather than who pays for it or who is benefited thereby. [18 R. C. L. 784.] In 39 Corpus Juris, 1274, section 1462, this is said: "The test of liability for the acts of the servant is whether in the particular service which the servant is engaged or requested to perform he continues liable to the direction and control of his original master or becomes subject to that of the person to whom he is lent or hired, or who requests

his services. It is not so much the actual exercise of control which is regarded as the right to exercise such control. To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person.'' [Standard Oil Co. v. Anderson, 212 U. S. 215, 53 L. Ed. 480; Boroughf v. Schmidt (Mo.), 259 S. W. 881, 883.]

Where the general employee of one person, using the employer's appliances, is doing the work of or for another under a contract or arrangement between the general employer of the servant and such other person for the doing of such work in that way and by that means, the fact that the other person gives information and directions to the servant as to details of the work or the manner of doing it does not make this general servant of the employer the servant of such other person in that work. 39 Corpus Juris, 1275, after the quotation therefrom, supra, further says: ''It is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary cooperation where the work furnished is part of a larger operation. A servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out the work to the servant, or gives him signals calling the service into activity, or gives him directions as to the details of the work and the manner of doing it.'' [Scherer v. Bryant, 273 Mo. 596, 201 S. W. 900; Flori v. Dolph (Mo.), 192 S. W. 949.] In Scherer v. Bryant, supra, the court said: ''It is said the principal test of the relationship of master and servant is control. In a case like this it is necessary carefully to 'distinguish between authoritative direction and control and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger operation.' [Standard Oil Co. v. Anderson, 212 U. S. 1, c. 222, 29 Sup. Ct. 254, 53 L. Ed. 480.] In the same case it is pointed out that one is not lifted out of his general employment and set down in the service of another by the mere fact that such other is authorized by the general master to indicate the work to be done or to furnish information or give signals calling the servant into activity. In Hurlbut v. Wabash Ry. Co., 130 Mo. 657, 31 S. W. 1051, the holding is of like effect. In this case, as in Coggin v. Railroad, 62 Ga. 1. c. 692, 35 Am. Rep. 132, there is no evidence that anyone other than the engineers 'interfered or had a right to interfere with the application of the steam, or with manipulating the engine. These were for the engineer as an expert—as a craftsman, skilled in his business. . . . The actual handling of the engine was exclusively for the engineer' '' (in this case the driver). To the same effect, under similar circumstances, is the ruling in Flori v. Dolph (Mo.), 192 S. W. 249.

When we come to consider what are familiarly termed "white mule" cases, we will find the same, at least in the older cases before gas-driven cars took the place of horse-drawn vehicles, under the head of "driver and team" cases. As to these, 39 Corpus Juris, 1277, says: "Applying the general rule, one who furnishes a driver and team to another for the latter's use for a trip or for a specified time or for a particular purpose is nevertheless liable for injuries resulting from the acts of the servant while performing such services for the third person, provided exclusive control of the driver is not vested in the hirer. The test of liability turns on the question whether the employer or the hirer controls the movements of the driver. Liability of the general employer for the acts of the driver furnished with the team is not affected by the fact that directions are given the driver as to when and where to go, that directions are given as to what shall be carried, or that directions are given to the driver to hurry or to take his time, or that the driver also assisted in the work that the hirer was doing for which the team was used." In Boroughf v. Schmidt (Mo.), 259 S. W. 881, the defendant owned a truck and for pay furnished it and a driver to another party to haul certain merchandise. In doing this the driver negligently struck and injured plaintiff. The court said: "The question here presented has been frequently decided by the appellate courts of England and the United States in the so-called carriage and driving cases. In these cases it has been almost universally held that where a master lets out his carriage with a driver and horses, under an agreement by which he is to receive pay for the use thereof, he is liable for an injury to a third person caused by the negligence of the driver in the management of the team during the period of hiring, and when the driver is obeying the orders of the hirer as to when and where he shall drive." Many cases are cited.

No case has been more frequently cited on this proposition than Standard Oil Co. v. Anderson, 212 U. S. 215, 53 L. Ed. 480. That high court formulated the general principles as quoted in Simmons v. Murray, 209 Mo. App. 248, 234 S. W. 1009, 1012. In applying these general rules to the particular facts the court said that when one person furnished another the implements or appliances and a person to operate same, "he did not furnish *them* but furnished the work they did" to such other person. "That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control," notwithstanding such servant obeyed the signals and directions given him in the course of the work. The court further said: "The simplest case, and that which was earliest decided, was where horses and a driver were furnished by a liveryman. In such cases the hirer, though he suggests the course of the journey, and, in a certain sense, directs it, still does not become the master of the driver, and responsible for his neg-

ligence, unless he specifically directs or brings about the negligent act. (Cases cited.)'' And further: "The case of Driscoll v. Towle, 181 Mass. 416, is in point here. In that case the defendant was engaged in a general teaming business. He furnished a horse, wagon and driver to the Boston Electric Light Company. The driver reported to the electric light company and received directions as to what to do and where to go from an employee of that company, but at night returned the horse and wagon to the defendant's stable and received pay from the defendant. While traveling to carry out an order received from the company he negligently injured the plaintiff, who brought an action to recover for the injuries, alleging that the driver was the defendant's servant. It was held that there was evidence which would warrant the jury in finding that the driver continued to be the defendant's servant. It was said in the opinion of the court, delivered by HOLMES, C. J. (now Mr. Justice Holmes): 'But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant; more than that is necessary to take him out of the relation established by the only contract which he has made and to make him a voluntary subject of a new sovereign,—as the master sometimes was called in the old books. . . . In this case the contract between the defendant and the electric light company was not stated in terms, but it fairly could have been found to have been an ordinary contract by the defendant to do his regular business by his servants in the common way. In all probability it was nothing more. Of course, in such cases the party who employs the contractor indicates the work to be done and in that sense controls the servant, as he would control the contractor, if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders which he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of intimacy and generality in the subjection of one to the other which is necessary in order to identify the two and to make the employer liable under the fiction that the act of the employed is his act.' ''

Burke v. Shaw Transfer Co., 211 Mo. App. 353, 243 S. W. 449, is like this case in its essential facts. An undertaker employed to conduct a funeral did not have sufficient equipment of his own and needed a cab to help convey the funeral party from the church to the cemetery and then to their homes. The defendant transfer company owned and furnished for hire cabs and drivers to persons needing such service and on the undertaker's order furnished a cab and driver on this occasion. The driver understood the business and needed little direction. He did, however, direct certain persons to

get in the cab and the driver understood that he was to take them as part of the funeral party to the cemetery and then to their respective homes, getting that information from the passengers. In doing this the driver by his negligent driving injured one of the passengers, who sued the transfer company. The Court of Appeals held the transfer company, which owned the cab and furnished it and the driver to the undertaker, liable as master for the driver's negligence. This court on certiorari, State ex rel. v. Trimble (Mo.), 250 S. W. 384, held not only that there was no conflict, but that the decision "is in harmony with the decisions of this court," citing Holloway v. Schield, 294 Mo. 512, 243 S. W. 163, and Scherer v. Bryant, 273 Mo. 596, 604, 201 S. W. 900.

In Schmedes v. Deffaa, 138 N. Y. Supp. 931, an undertaker employed a liveryman, defendant in the action, to supply him with two or three carriages, horses and drivers for use in a funeral. This liveryman furnished one or two teams, carriages and drivers of his own, but, in turn, hired one team, carriage and driver from another liveryman, sending all three to the undertaker. The driver of this other carriage procured by the defendant liveryman caused damage by his careless driving. All the judges of the appellate division agreed that the drivers were not the servants of the undertaker, but disagreed as to all three of them being servants of the first liveryman who contracted with the undertaker to furnish them. The Court of Appeals in this same case, 108 N. E. 1107, held with the minority opinion that all three drivers were servants of such liveryman and not the undertaker, citing Kellogg v. Church Charity Foundation, 203 N. Y. 191, 38 L. R. A. (N. S.) 481. [See, also, Wissner v. Hartmann, 200 N. Y. Supp. 408; Frerker v. Nicholson (Colo.), 92 Pac. 224, 13 L. R. A. (N. S.) 1122, and case note; Morris v. Trudo (Vt.), 74 Atl. 387, 25 L. R. A. (N. S.) 33, and case note; Ash v. Century Lumber Co. (Iowa), 133 N. W. 888, 38 L. R. A. (N. S.) 973; L. R. A. 1918E, 121.]

In one of the best considered cases we have found, Wagner v. Larsen, 174 Wis. 26, 182 N. W. 336, the law is stated thus: "Where an owner hires his team and driver, or his automobile and chauffeur, or his machine and operator to another to do work to be designated and as directed by the hirer, the hirer having no authority by the terms of the contract of hire to discharge the driver, chauffeur, or operator and substitute another, the driver, chauffeur, or operator remains the servant of the owner in matters relating to the safety and management of the team, automobile, or machine, and the owner is liable to third persons for damages resulting from the negligent management or operation of the team, automobile, or machine by such servant." Many cases are cited. The court then states the underlying reason for this rule to be: "The reason is that the hiring is not of the team distinct from the driver or of the driver distinct

from the team, but is the hiring of the entity composed of the two. While the hirer acquires dominion or authority over the entity to designate the work that shall be done and direct the manner of doing it, he acquires no authority to direct how the team shall be driven, managed, or cared for, nor can he divide the entity by separating the driver from the team. He may dispense with the services of the entity—the driver and the team—but he cannot discharge the driver and substitute another. . . . Hence the owner says, in effect: 'I will not hire my team to be driven by a stranger, but I will hire my team with a driver of my own choosing, one in whom I repose trust and confidence. You shall not discharge him and substitute another. That is a right I reserve.' It is entirely possible and consistent, as pointed out in Driscoll v. Towle, 181 Mass. 416, 63 N. E. 922, for the driver to be the servant of the hirer in the general performance of the work and remain the servant of the owner in the details of driving, caring for, and managing of the team.''

We need not determine whether Grothmann v. Hermann (Mo. App.), 241 S. W. 461, is in conflict with our conclusion here, though much like it on the facts, as the negligence of the driver of the one of the hired motor cars in that case causing plaintiff's injury did not occur in connection with and as part of operating the car owned by the hirer, and of which the hirer put the negligent driver in charge, but in negligently shutting the door of another hired car.

Many of the cases involving the question of who is the master of the negligent servant say that the question is often one for the jury, and so it is when the vital facts are in dispute or different legitimate inferences may be drawn therefrom. If such is the case here, the appealing defendant, Rindskopf, has had the benefit of a jury trial on that issue under an instruction drawn by himself. But, as we have said, the essential facts here are not in dispute and we think the only inference allowable therefrom is that defendant Rindskopf was the master and responsible for the negligence of the driver Hilton. Whether this driver was negligent and his negligence caused plaintiff's injury was the only question here for the jury to determine.

Under this view of the case, even if it be true that one or more of the instructions to the jury assumed that defendant Rindskopf sustained the relation of master to the negligent driver, such would not be error, but is a correct statement of the applicable law. The demurrer to the evidence should have been sustained as to defendant Ambruster and a verdict directed for him, but, as the jury did this, the result is the same. And it is also true that the giving of any instruction too favorable to Ambruster is harmless error. Even if he was jointly liable with Rindskopf under the doctrine of *respondeat superior,* they were joint tort-feasors and each liable severally for the

**1248**

whole injury as well as jointly. Appellant Rindskopf cannot complain of the discharge of Ambruster by reason of any error of the court or otherwise. [Barr v. Nafziger Baking Co., 328 Mo. 423, 41 S. W. (2d) 559, 563; Neal v. Curtis & Co. Mfg. Co., 328 Mo. 389, 41 S. W. (2d) 543, 553.] The giving of Instruction No. 4 on behalf of defendant Ambruster was not error of which this appellant can complain, and plaintiff-appellant does not do so.

■ Defendant Rindskopf, though now conceding that the evidence was sufficient to warrant a finding that the driver Hilton was guilty of negligence resulting in plaintiff's injury, for which he is to be held liable as master, yet was entitled to a submission of the driver's negligence on proper instructions. A material difficulty is here presented in that plaintiff chose to and was allowed to submit her case to the jury without any instructions on her part as to the law of the case in accordance with which the jury was sworn to try it— no instructions outlining the issues to be tried or telling the jury what facts, if found for plaintiff, would warrant the jury in convicting the driver of this truck and his responsible master of negligence. The jury, without even having heard read the petition and answers, was left without chart or compass as to the issues and the law of the case except the meager aid given by defendants' instructions. I must protest again as to this method of trying cases. However, no objections were made or exceptions preserved in this respect and we must consider the case as it is.

■ The defendant Rindskopf asserts error in refusing to give his Instruction No. 3 as asked by him and in modifying it and giving it as modified. Obviously the error, if any, is in the modification. The instruction as asked placed before the jury the fact that if Koehler's car in which plaintiff was riding and the flower truck driven by Hilton, Rindskopf's servant, approached the crossing where the collision occurred so as to reach the same at approximately the same time, then Koehler should have yielded the right of way to the flower truck, and that the driver thereof, Hilton, had a right to assume that Koehler would do this and conduct his driving accordingly, until he became aware that Koehler was not doing so, in which event his negligence would be measured by the humanitarian rule. The court modified this instruction by inserting the proviso that the driver Hilton was, in approaching the intersection, driving "in a careful manner and without negligence." Was this an erroneous modification? We think not. Granting that Hilton and the flower truck had the right of way and could rightly proceed on that theory, yet if he was doing so in a negligent manner—going at a reckless speed, without his car under control, giving no warning at a busy crossing, etc., would not the failure of Koehler and his car to yield the right of way amount to no more than contributory negligence?

Of course, when the flower truck reached a point where the humanitarian rule began to operate, that blots out the contributory negligence of Koehler, if any (and the jury evidently found there was not any), as appellant Rindskopf concedes; but as to this plaintiff, a guest in Koehler's car, contributory negligence never began. Koehler's negligence could not be imputed to his guest, this plaintiff. The instruction would have been wrong without this modification. It might well have been refused as a whole.

■ Appellant Rindskopf further says it was error to use the word "negligence" in the modification of the instruction as characterizing the conduct of the driver of the flower truck without defining it to the jury and without setting out the facts which, if found, would constitute negligence. What we have just said disposes of this contention. It was defendant's duty in presenting this instruction to do so correctly, and if the trial court, instead of refusing the incorrect one outright, attempted to correct it and the correction was good as far as it went, defendant is in no position to complain. It was clearly defendant's duty to assist the court in doing what was really his own duty in making the instruction more complete, specific, and definite, if he thought the correction deficient in that respect.

■ The defendant insists that the verdict and judgment for $20,000 in this case is so excessive as to require interference by this court and calls for a new trial. There is nothing connected with the case which prevents our curing the excessiveness of the verdict, if such it be, by permitting the plaintiff to enter a *remittitur*, at her option, as the price of not granting, a new trial. In considering whether the verdict is so excessive as to require this court to require plaintiff to reduce the verdict by entering a *remittitur*, or suffer a new trial, we keep in mind the rule that we cannot substitute our views for that of the jury as to the amount of the verdict. The only question is whether the amount of the verdict is within the bounds of reason and reasonably proportionate to the injuries proven. While giving the jury a sound discretion in this matter, we cannot allow the jury to act arbitrarily in the matter or allow verdicts to stand which work a palpable injustice to the defendant. No two cases are alike in this respect and every case must stand on its own peculiar facts. The law has fixed certain general rules for measuring damages in personal injury actions and these rules are given to the jury in the form of instructions, and the court must see to it, as best it can, that the jury gives due regard to such measure of damages and does not by the amount given palpably, through mistake or otherwise, disregard such rules. When the facts as to the injuries inflicted and losses sustained are similar, though never identical, there should be a reasonable uniformity as to the amount of verdicts and judgments in the various cases. Precedents are not altogether valueless even on

the amount of verdicts which we have allowed to stand or caused to be reduced, but should be consulted whenever this question is presented. On account of the infinite variety of the facts, often necessarily speculative and mere matters of opinion, precedents are at most merely helpful. There is always, however, this safeguard given to every plaintiff, that he is not compelled to accept the reduction of his verdict, but may have a new trial. In saying this, we are not unaware of the hardship placed on a plaintiff in being compelled to exercise such an option.

Each of the parties have given a reasonably fair statement of the facts bearing on the question of the amount of damages and the evidence on this question, being all introduced by plaintiff, presents no contradictions. The medical evidence seems unusually fair and candid. Plaintiff, at the time of her injury, was a trained nurse, unmarried, fifty-eight years of age, in good health, and earning $65 per month plus her room and board. The trial was more than a year after her injury, so that the results of her injuries, though necessarily somewhat speculative, were fairly well developed. Plaintiff suffered substantially the following injuries: She was rendered unconscious, taken to a hospital and remained there about a month. Her injuries were mostly about the head and right shoulder and arm, though receiving other serious bruises. She was bleeding some from the mouth and ear and this continued for some days. The right ear drum was perforated, resulting in permanent partial loss of hearing to the extent of about seventy-five per cent of normal. The other ear was not injured and the hearing was normal in that ear. There was a fracture of the collar bone with severe injury to the nerves as it comes off the spine, causing nervousness and a secondary neurosis. The doctors were uncertain as to whether this condition would be permanent. There was an injury to the right shoulder which necessitated an operation, moderately severe, to break up adhesions. This injury caused a permanent limitation of the use of the right shoulder, arm and hand, with considerable loss of use of the whole arm and hand. She could not raise her arm above horizontal and there was a fifty per cent loss in movement and use below horizontal. There was severe injury to the soft structures of the back causing pain and discomfort, which still persisted at the time of the trial. Considerable nervousness resulted with inability to sleep soundly as before the accident. Plaintiff was confined to the hospital for about four weeks. She returned to the hospital twice thereafter, once for the operation to her shoulder and at another time for an operation on her nose for the purpose of aiding her hearing. The total hospital and medical expenses amounted to $775. While the record shows that plaintiff was earning $65 per month as a nurse, there is no direct evidence as to her loss of wages, though such is inferable from the facts.

Appellant Rindskopf cites the case of Crockett v. Kansas City Rys. Co. (Mo.), 243 S. W. 902, as being directly in point on the question of damages, and there is much similarity in the injuries in this and that case. Plaintiff points out that there are injuries in this case not present in the Crockett case, to-wit, "fibrinous pleurisy—a severe injury to the brain—a painful and permanent injury to the back," and a second operation, that of the nose in hopes of remedying the defect of hearing; also that in the Crockett case the plaintiff was a married woman and there was not the loss of earnings, as in this case. The medical and hospital bills in the two cases are about the same. In the Crockett case the court cut down the judgment to $10,000 and defendant insists that we do the same. We are not able to say that the injuries and losses are not some greater in this case. Plaintiff cites Lewis v. St. Louis Independent Packing Co. (Mo.), 3 S. W. (2d) 244, where the court said $17,000 was not excessive, but we think the injuries were greater and quite different than in this case. Plaintiff's other cited cases are Taylor v. Missouri Pac. Railroad Co., 311 Mo. 604, 279 S. W. 115, where an award of $25,000 was allowed, and Margulis v. National Enameling & Stamping Co., 324 Mo. 420, 23 S. W. (2d) 1049, where $27,500 was approved, but the injuries and suffering and loss of earnings and earning power in those cases were much greater and are hardly comparable to what is shown here.

Our conclusion is that if plaintiff will file a *remittitur* of $7,500 in this case as of the date of the judgment, a new judgment will be entered for $12,500 as of that date; otherwise, the case will be reversed and remanded for new trial. It is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.*, absent.